## Melton v. Sparks

(Decided Jan. 31, 1936.)

592

H. N. DEAN for appellant.

L. C. LITTLE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER.
—Affirming.

The parties to this litigation are adjoining landowners. Both are remote vendees of Thomas I. Becknell. The controversy is over the location of the line between them. Sparks prevailed in the trial court, and Melton appeals.

March 23, 1895, Thomas I. Becknell sold to Wm. Sparks the western part of his farm and described it thus:

"Beginning at a white oak and two chestnuts, a corner of John A. Lane, thence with Lane's line up the ridge to a locust, thence with same, to his fence in the low gap. Thence with said line to a flat rock on the ridge, thence with the meanders of the ridge to a corner made by Thomas I. Becknell and Eli Sparks, made on *two chestnut oaks, thence a straight line down the school house hollow to a sugar tree in William Becknell's line,* thence with Becknell's line to the Widow Haley's line, thence with same to beginning."

Eli Sparks now owns this by inheritance from his father and by purchase from his brothers and sisters. We have italicized in the above description the line in question. This line is described in this record as be-

ginning at two chestnut oaks on a ridge and running thence a straight line down the schoolhouse hollow S. 16 E. 126 poles to a marked sugar tree in the Becknell line and east of the schoolhouse.

After making the sale to Sparks, Thomas I Becknell continued to live on the eastern part of his farm for two or three years, then sold it to Ross Azbill by this description:

*"Beginning on the bank of the branch near the road on a sugar tree corner to the land of W. M. Spark's heirs, thence with their line to J. A. Lane's land,* thence with his line to C. H. Click (Now William's line) thence with his and other lines to W. W. Becknell's line, thence his line to W. K. Becknell's line thence with his line to the beginning."

In this description we have italicized the line in question. For the appellant it is contended the proper location and description of this line is, beginning at a marked sugar tree in Becknell's line, west of the schoolhouse and in front of Ross Azbill's house, thence N. 7 W. 67 poles to 2 chestnut oaks (now black gum and chestnut oak) thence N. 45 W. 46 poles to a flatrock in Lane's line.

Between the division line as claimed by Sparks and the line as claimed by Melton there is about 11 6/8 acres of land which is in dispute.

Reading the descriptions by which these two portions of this farm are designated shows the difficulty that this record presents. We shall endeavor to illustrate the matter as best we can.

Whenever we find the eastern boundary of Sparks land, this puzzle is solved, for Melton cannot go beyond the Spark's line, since his deed calls for the Spark's line.

Starting in at the beginning corner of Sparks, we follow the first line north to the locust, then we go northeastwardly to a fence in low gap, then almost same course to a flat rock on the ridge. Every one is agreed and everything is harmonious to this point. The question now is, Where does this line go from the flat rock?

For Sparks it is contended it continues the same general course to two chestnut oaks which he says he and Thomas I. Becknell marked, while for Melton it is

NORTH

SOUTH

contended that from the flat rock the line runs due S. E. 46 poles to two chestnut oaks, now one chestnut oak and a black gum, from this point, wherever it may be, the line goes straight to a sugar tree, wherever that may be.

Spark's deed calls for a straight line from two chestnut oaks down the school house hollow to a sugar tree, and all three of the maps in this record show the line on the eastern side of the property in dispute follows the general course of a stream shown on these maps flowing south and emptying into Long Branch near the schoolhouse also shown on these maps. The line east of the disputed land crosses this stream at two places. Common sense tells us that there is a hollow that follows the general course of this stream and which was made by this stream.

Since this stream empties into Long Branch practically opposite this schoolhouse, it is quite natural this hollow should be called schoolhouse hollow, and many witnesses for Sparks and some of those for Melton testify they had heard it so called for years. One such is Flemon Azbill, a man 58 years of age, who had lived near this schoolhouse for 40 years and whom Mel-

ton introduced. Owen Becknell, another of Melton's witnesses gave similiar testimony. Human experience supports the credibility of their testimony. Mr. Melton and his counsel saw this, and they strenuously endeavored to show, and did show by some witnesses, that another hollow located higher up Long Branch and near the Ross Azbill house was the one known as the schoolhouse hollow, but the schoolhouse was not located there, and to explain the name they said that hollow was so called because Mr. Lane's children came down it on their way to school. That is not very convincing. We are sure the schoolhouse hollow is where we find the stream, the hollow, and the schoolhouse, and that the sugar tree farthest down Long Branch is the sugar tree called for in the deed to Sparks, and is also the beginning corner of the description in Mr. Melton's deed.

Turning back and reading this description, we see that, from this sugar tree corner to the land of W. M. Sparks' heirs, Melton's description continues *thence with their line to J. A. Lane's land.* Now, if the upper sugar tree, the one near the Azbill house were the one referred to, then the recital in this description would have been thence with their *lines,* etc., for the western boundary of this disputed strip is made up of two lines.

### The Cox House

Mr. Melton and his counsel saw this, and to offset its effect took the deposition of Mr. Jeptha Cox in Miami, Ohio, and he testified he built a house on this disputed land in the year 1916, and he fixed the date by the age of one of his children who was born in that house, and he testified to clearing some land about this house, and that some clearing was done on some land north of that near the head of the hollow, and that Mr. Sparks made no objection. This deposition is one of a batch of five that were taken there in Miami. There is no showing that any notice was given, that Mr. Sparks was present in person or by attorney, and there was no cross-examination, but no motion was made to strike it from the files. Mr. Sparks later testified that his mother was then living and had leased this land to Mr. Cox, and he is supported in that by his witness, Kindred. So he in that way accounted for this house and clearing. There was conflicting evidence about when this clearing and building was done, but, as it covers some of the Sparks land Cox had leased and

some of the Melton farm he had purchased, we are quite sure it was not done before this purchase, and that was April 25, 1919. No effort was made to disprove that Cox did what he did on this land under a lease from Mrs. Sparks.

### Adverse Possession.

Since the testimony that Cox was on this disputed property under a lease from Mrs. Sparks is not controverted, it follows his possession was amicable and not adverse. Moreover, if his possession had been adverse, it had not that continuity necessary to ripen a title under it, for the evidence shows this house has been vacant about half of the time since it was erected. The showing made does not in any sense meet the requirements for acquiring title through adverse possession as laid down in Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961.

### Sparks as a Witness

Melton filed exceptions to the testimony of Mr. Sparks, and he argues now that we should not consider Sparks' testimony that he and Thomas I. Becknell (now dead) marked as corner trees the two chestnut oaks, and the maple east of the schoolhouse, when Sparks' father bought this land from Becknell, but Mr. Melton's counsel made Mr. Sparks a competent witness on this point by opening this field and asking Mr. Sparks about these matters for the first time on his cross-examination, thereby waiving his incompetency.

It is contended Mr. Sparks' testimony that his mother, who is now dead, leased the land in dispute to Jeptha Cox should not be considered, but Mr. Sparks has no interest that is adverse to his mother; hence he was not disqualified. See Trevethan's Ex'r v. Dees' Ex'rs, 221 Ky. 396, 298 S. W. 975.

Mr. Sparks gave this testimony in rebuttal, and it is argued that for that reason it should not be considered, and the rejection of the evidence of Mr. Kindred is urged for the same reason. This testimony was introduced to rebut what Jeptha Cox had testified regarding the erection of this house and doing this clearing. Melton introduced Cox to support his claim of adverse possession, upon which he had the burden of proof, and there was no need for Sparks to offer evidence on this issue until Mr. Melton had introduced evidence on the

subject, and, when he did, Mr. Sparks' evidence on this score properly came in rebuttal.

Twenty-five different witnesses testified. To discuss their testimony in detail would serve no useful purpose, as the main features have been covered. In reviewing this case, after coming to a definite conclusion as to the location of schoolhouse hollow, all other matters became rather unimportant.

Judgment affirmed.